# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1110V
UNPUBLISHED

| | |
|---|---|
| VICTORIA EDENS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: April 26, 2021<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*David John Carney, Green & Schafle, LLC, Philadelphia, PA,* for Petitioner.

*Amanda Pasciuto, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

  On July 30, 2019, Victoria Edens filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") caused in fact by the influenza vaccine she received on November 1, 2018. Petition at 1, ¶¶ 3, 18. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and has been conceded by Respondent.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to a damages award in the amount **$70,442.92, representing $70,000.00 for her past pain and suffering and $442.92 for her unreimbursed out-of-pocket expenses.**

I.     **Relevant Procedural History**

Shortly after filing the Petition in July 2019, Ms. Edens filed her affidavit and the medical records required by the Vaccine Act. Exhibits 1-7, ECF No. 6; *see* Section 11(c). Approximately six months later, she filed further documentation regarding vaccination. Exhibit 8, ECF No. 12. On September 3, 2020, Petitioner filed some updated medical records and a status report indicating she had forwarded a demand and supporting documentation to Respondent. Exhibit 9, ECF No. 16; Status Report, ECF No. 17.

Two months later, on November 2, 2020, Respondent filed a status report indicating that he wished to engage in settlement discussions. ECF No. 19. A few weeks thereafter, he filed his Rule 4 Report conceding entitlement, and I issued a Ruling on Entitlement that same day. ECF Nos. 21-22. During late 2020 and early 2021, Petitioner filed additional updated medical records on several occasions. Exhibits 10-14, ECF Nos. 24-25, 28, 30.

On December 15, 2020, the parties informed me that they had reached an impasse in their damages discussions. ECF No. 26. They filed simultaneous briefs on February 4, 2021. Respondent's Brief on Damages ("Res. Brief"), ECF No. 31; Petitioner's Brief in Support of Damages ("Pet. Brief"), ECF No. 32. In her brief, Petitioner requested that I determine the appropriate amount of damages in a written decision, without oral argument. Pet Brief at 1-2. The parties filed their responsive briefs two weeks thereafter. Petitioner's Response to Res. Brief ("Pet. Reply"), ECF No. 34; Respondent's Reply Brief on Damages ("Res. Reply"), ECF No. 35. The issue is now ripe for adjudication.

II.    **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health &*

2

*Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III.     Prior SIRVA Compensation Within SPU[4]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2021, 1,875 SPU SIRVA cases have resolved since the inception of SPU

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

3

on July 1, 2014. Compensation was awarded in 1,820 of these cases, with the remaining 55 cases dismissed.

Of the compensated cases, 1,058 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 47 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[5]

1,011 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - 987 cases via proffer and 24 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 762 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

---

[5] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

4

|  | **Damages Decisions by Special Master** | **Proffered[6] Damages** | **Stipulated Damages** | **Stipulated[7] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *47* | *987* | *24* | *762* |
| **Lowest** | $55,619.60 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $75,044.44 | $74,040.17 | $90,000.00 | $47,500.00 |
| **Median** | **$86,784.56** | **$93,975.95** | **$115,214.49** | **$65,000.00** |
| **3rd Quartile** | $125,000.00 | $120,390.74 | $153,788.29 | $91,250.53 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $509,552.31 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 47 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $55,000.00 to $185,000.00, with $85,000.00 as the median amount. Only four of these cases involved an award for future pain and suffering, with yearly awards ranging from $500.00 to $1,000.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment of 40 days to over six months. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. These SIRVAs usually resolved after one to two cortisone injections and two months or less of PT. None required surgery. The duration of the injury ranged from six to 29 months, with petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed

---

[6] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 50 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In three cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering. In the fourth case involving an award of future pain and suffering, the petitioner provided evidence of an ongoing SIRVA expected to resolve within the subsequent year.

### IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

#### A. The Parties' Arguments

The parties agree Petitioner should be awarded $442.92 for her unreimbursed out-of-pocket expenses.[9] Thus, the only area of disagreement is regarding the amount of compensation which should be awarded for Petitioner's pain and suffering.

Petitioner requests $100,000.00 for this damages component. Pet. Brief at 1. Citing five reasoned decisions in other SPU SIRVA cases,[10] Petitioner asserted that the

---

[9] In their initial briefing, the parties indicated they had not agreed upon the appropriate amount to be awarded for petitioner's out-of-pocket medical expenses. Pet. Brief at 15 n.1; Res. Brief at 1. In their responsive briefs, filed two weeks later, the parties indicated they had agreed upon the amount of $442.92. Pet. Reply at 1; Res. Reply at 1.

[10] The amounts awarded for actual pain and suffering in these cases range from $75,000.00 to $100,000.00: *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019) (awarding $100,000.00 for actual pain and suffering); *Dhanoa*, 2018 WL 1221922 (awarding $85,000.00 for actual pain and suffering and $9,900.99 for projected pain and suffering); *Dirksen v. Sec'y Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for actual pain and suffering); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for actual pain and suffering); *Marino v. Sec'y Health & Human Servs.*, No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for actual pain and suffering).

6

severity and duration of her symptoms were similar to those suffered by the *Young* petitioner, who was awarded $100,000.00 for pain and suffering, or the *Dhanoa* petitioner, who was awarded $85,000.00 for past pain and suffering plus $9,900.99 for future pain and suffering during the following year. Pet. Brief at 10-14. While making these comparisons, Petitioner emphasized the six-day period between vaccination and the date she first sought treatment, the more than two-year duration of her injury, and the injury's effects on her personal life and ability to perform her job as a school bus driver. *Id.* at 13-14.

In reaction, Respondent maintained Petitioner should be awarded only $67,500.00 for her past pain and suffering. Res. Brief at 1. While acknowledging the factors mentioned by Petitioner, Respondent argued Petitioner's SIRVA should be characterized as mild. *Id.* at 7. He emphasized the lower levels of pain Petitioner reported throughout her injury, the relief Petitioner gained by the four cortisone injections she received, the lack of any additional treatment such as formal physical therapy ("PT"), the mildness of any limitation in range of motion ("ROM"), and the lack of evidence that Petitioner's SIRVA injury interfered with her ability to perform her job. *Id.* at 7-11.

Contrasting the facts and circumstances in Petitioner's case to those in *Dhanoa*,[11] Respondent argued that the *Dhanoa* petitioner suffered more severe levels of pain and underwent 23 PT sessions over an eight-month period. Res. Brief at 9-10, 9 n.12 (citing *Dhanoa,* 2018 WL 1221922, at *3). Thus, he maintained Petitioner's award should be less than that awarded in *Dhanoa*. *Id.* at 10. Respondent also criticized comparisons between reasoned damages decisions (which have been issued in approximately 60 SPU SIRVA cases) and the "meeting-in-the-middle" method that he believes is sometimes being utilized to split the difference between each side's pain and suffering figure. *Id.* at 6-7. Respondent asserted that the large number of proffered cases in SPU is a more accurate representation of the appropriate of damages to be awarded. *Id.* at 7.

In her responsive brief, Petitioner disagreed with Respondent's characterization of her SIRVA as mild, took issue with criticism of comparisons with prior reasoned damages decisions in SPU SIRVA cases, and challenged Respondent's claim that Petitioner has not established that her injury interfered with her ability to perform her job. Pet. Reply at 2-7. Countering Respondent's argument that comparisons with SPU SIRVA cases involving reasoned damages decisions has increased the number of cases requiring my

---

[11] Respondent also compared Petitioner's SIRVA to the injury suffered by the petitioner in *Binette*. Res. Brief at 10-11 (citing *Binette v. Sec'y of Health & Human Servs.,* No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019)). While Respondent initially inferred Petitioner had made this comparison as well, ony Respondent referenced this case. *Id.*; Res. Reply at 5-6. Since neither party is arguing that Petitioner's symptoms are similar to those suffered by the *Binette* petitioner, who received $130,000.00 for her past and $1,000.00 per year for her future pain and suffering, and Petitioner has not made a claim for an award designated for any future pain and suffering, further analysis of this comparison is not needed.

7

determination, Petitioner attributed this increase, which has not been substantial,[12] to what she characterized as a failure to engage in good faith damages discussions by Respondent. *Id.* at 4-5.

In his responsive brief, Respondent disagreed with Petitioner's claim that he has exhibited bad faith during damages discussions. He also drew a distinction between informal settlements and parties' attempts to informally resolve the issue of damages after entitlement has been determined and criticized what he viewed as Petitioner's failure to recognize this distinction. Res. Reply at 2-3. He reiterated his arguments regarding the severity of Petitioner's SIRVA and the lack of documentation regarding Petitioner's ability to perform her job. *Id.* at 3-7.

### B. Analysis

I have previously addressed the more general arguments about calculation of pain and suffering damages made by Respondent during expedited motions days and in other damages decisions. While noting that this end result may occur in some cases (and disappoint both sides as a result), I have in fact *rejected* the "meeting-in-the-middle" method Respondent claims is being used, based on the proposition that "each petitioner deserves an examination of the specific facts and circumstances in her or his case." *Sakovits*, 2020 WL 3729420, at *3. But I also have rejected Respondent's argument that the amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded than reasoned decisions from the court and special masters. *Id.* at *4. While "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they are not as persuasive as reasoned decisions from a judicial neutral. *Id.* (emphasis in original). Taken as a whole, the data from these decisions can be a helpful gauge of the compensation being awarded in SPU SIRVA cases.

A thorough review of the medical records filed in this case reveals that Petitioner's claims of severe pain, at a level of five out of ten the day after vaccination and increasing to eight out of ten within six days of vaccination, is not supported by the record in this

---

[12] The Table below shows the slight increase in SPU SIRVA cases requiring reasoned damages decisions. This increase is not significant, given the large number of SPU SIRVA cases resolved each year: 2018 = 296; 2019 = 404; 2020 = 426. Thus, the percentage of SPU SIRVA cases requiring a requiring a damages determination from me remains low, around 5 percent.

|  | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | Total for Year |
|---|---|---|---|---|---|
| 2018 Damages Decisions | 2 | 2 | 2 | 4 | 10 |
| 2019 Damages Decisions | 4 | 7 | 7 | 1 | 19 |
| 2020 Damages Decisions | 1 | 8 | 10 | 3 | 23 |
| 2021 Damages Decisions | 9 |  |  |  |  |

case. *See* Pet. Brief at 5; Exhibit 2 at ¶¶ 11-12 (Petitioner's Affidavit). While Petitioner quickly sought treatment for her right shoulder pain, six days after vaccination, her pain is characterized as "soreness" following vaccination in the medical record from that visit. Exhibit 3 at 64. At this November 7, 2018 visit, Petitioner was also treated for an upper respiratory infection ("URI"), congestion and cough. Most entries involve the diagnosis and treatment of this condition. *Id.* at 64-68. Upon examination, her right shoulder was observed to be "[s]till sore, [with] no redness or swelling. *Id.* at 65. There is no entry regarding any mention of limited ROM or assessment or treatment of this complaint. *Id.* While this omission may be due, in part, to a lack of concern on the part of Petitioner's primary care provider ("PCP"), it undermines Petitioner's current allegation that her initial pain was severe.

When she returned to her PCP on November 26, 2018, it appeared her pain had increased. Petitioner described her right arm as "very sore when lifting in abduction and flexion" and her pain as throbbing and worse at night. Exhibit 3 at 69. While unclear when she started taking this medication or when it was prescribed, Petitioner reported that "Mobic doesn't seem to help much." *Id.* In this record, her PCP noted that Petitioner "[h]as had bursitis in her R[13] shoulder in the past" Exhibit 3 at 69. Upon examination, he observed tenderness and swelling and ordered an ultrasound which revealed a small nodule at the site of vaccination, thought to be a hematoma. *Id.* at 65, 76-77.

When seen by an orthopedist two months later, on January 22, 2019, Petitioner described her pain as "aching, stabbing, burning, nagging, shooting, and sharp," interfering with her sleep, and better if she didn't move her arm. Exhibit 5 at 5. However, she rated the level of her pain as only four out of ten. *Id.* She exhibited mildly limited ROM and good rotator cuff strength. The orthopedist prescribed a home exercise program ("HEP") to increase Petitioner's ROM and strength, instructed her to take ant-inflammatory medication, and administered a cortisone injection. *Id.* at 6. Thus, according to the medical records, Petitioner's initial soreness had progressed to a moderate level of aching, stabbing, and burning, pain within several weeks of vaccination. There is nothing in the medical records to support Petitioner's claim of more severe levels of pain during any portion of her injury.

In addition to discussing the severity of her pain, Petitioner stressed the more than two-year duration of her SIRVA. However, the medical records reveal that Petitioner reported good relief from the four cortisone injections she received in 2019-2020: on January 22, March 18, October 7, and June 22. *See* Exhibits 5 at 2-3, 6; 9 at 5; 10 at 4-5. For example, after receiving her first injection on January 22, 2019, Petitioner did not return to the orthopedist until March 18, 2019. Exhibit 5 at 2-3. The medical record from

---

[13] This entry made have mistakenly referenced Petitioner's right, rather than left, shoulder. The medical records clearly establish that Petitioner had chronic left shoulder, most likely bursitis, throughout 2015-17. Exhibit 3 at 2-14.

9

that visit indicates Petitioner "had good relief with her last cortisone injection and would like another one today to help with the last of her pain." *Id.* at 2. One month after her second injection, administered on March 18, 2019, Petitioner was seen by her PCP for ear pain and to follow-up regarding her blood pressure. Exhibit 6 at 5. There is no mention of right shoulder pain in the medical record from that visit. *Id.* at 5-7.

During the two-years following vaccination, Petitioner was treated for right shoulder pain on only seven occasions: twice prior to her first injection, the four appointments when she received injections, and one appointment on June 19, 2019, during the almost seven-month period between her second and third injections. She relied primarily on these four injections, the June 19, 2019 Mobic prescription, and her HEP program. At the June 19, 2019 appointment when Mobic was prescribed, Petitioner reported only intermittent pain. Exhibit 6 at 8. She mentioned no issues driving the school bus and received certification for renewal of her commercial driver's license. Exhibit 6 at 8-9.

The fact that Petitioner never attended formal PT or pursued other treatment further supports the premise, already indicated by Petitioner's comments in the medical records, that she obtained good pain relief from each cortisone injection. This unusual course of treatment and reported periods of relief distinguishes Petitioner's case from that of other petitioners who received fewer injections and reported little or no relief from any cortisone injections administered or PT attended. Characterizing Petitioner's pain and suffering as occurring over a more than two-year period is not accurate. And she is not entitled to the greater award which would be appropriate had she truly experienced constant pain and engaged in medical treatment throughout this time.

I find that the Petitioner's pain and suffering award in this case should be lower than that awarded to the *Dhanoa* petitioner, who reported much higher levels of pain and more severely limited ROM, underwent 23 PT sessions over a period of seven months, and experienced the constant effects of her SIRVA for more than three years after vaccination. *Dhanoa,* 2018 WL 1221922, at *3-5. A comparison to the *Young* case is even less helpful, as that petitioner reported more severe symptoms, a longer duration of pain, and a more severely limited ROM than the *Dhanoa* petitioner. *Young*, 2019 WL 664495, at *2-3, 6-7. At one point, the *Young* petitioner was assessed with a 45 percent disability and suffered a reoccurrence of shoulder pain more than a year after vaccination. *Id.* at *2.

While the amounts awarded in the other cases cited by Petitioner are closer to what is appropriate in this case, given the unusual treatment Petitioner received and resulting reduction and return of her pain, it is difficult to perform any comparison. Indeed - there are some similarities with cases not mentioned by the parties in which petitioners were awarded amounts for actual pain and suffering between $68,000.00 to $72,500.00,

although none closely mirror Petitioner's circumstances.[14] Based on the record as a whole, specifically the lower levels of pain reported by Petitioner, her mildly limited ROM, and the temporary relief she obtained for several months after each cortisone injection, I find that $70,000.00 for actual pain and suffering is an appropriate award in this case.

Although Petitioner alleges ongoing symptoms and visited her orthopedist again on December 8, 2020, she has not requested an award for *future* pain and suffering in this case. *See* Exhibits 13 at 5-6; 14 (results of MRI).[15] And there is not sufficient evidence in the record as it currently stands to support such an award.

### V.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $70,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering. I also find that Petitioner is entitled to $442.92.00 for her past expenses.**

**I thus award Petitioner a lump sum payment of $70,442.92, representing $70,000.00 for her actual pain and suffering and $442.9 for her actual unreimbursable expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this decision.[16]

**IT IS SO ORDERED.**

                              **s/Brian H. Corcoran**
                              Brian H. Corcoran
                              Chief Special Master

---

[14] *See, e.g. Tjaden v. Sec'y of Health & Human Servs.,* No. 19-0419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021) (awarding $68,000.00 for actual pain and suffering and $320.00 for actual unreimburseable expenses); *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-0291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020) (awarding $72,500.00 for actual pain and suffering).

[15] The results of the MRI, performed on December 14, 2020, MRI showed a small amount of inflammation and fluid in the subacromial subdeltoid bursa and undersurface tear in the distal supraspinatus tendon, and minimal subacromial spurring. Exhibit 14 at 1.

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.